# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Julie L.P.,

        Plaintiff,

v.

Martin J. O'Malley,
*Commissioner of Social Security Admin.*,

        Defendant.

Case No. 23-cv-2980 (PJS/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Julie L.P.'s ("Plaintiff") Complaint seeking judicial review of a final decision by the Commissioner denying her application for supplemental security income. (*See generally* Dkt. 1.)  The parties have filed briefs "present[ing] for decision" Plaintiff's request for judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").[1]  (*See* Dkts. 14, 16.)

For the reasons stated below, Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 14) should be denied and the Commissioner's request that the Court affirm the decision (Dkt. 16) should be granted.

---

[1]  As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

# I.    BACKGROUND

On October 18, 2021, Plaintiff protectively filed an application for Title XVI Supplemental Security Income, alleging disability as of April 27, 2017, due to major depression and an anxiety disorder.  (R. 287-91, 321.)[2]  Her application was denied initially and on reconsideration.  (R. 200-203, 216-220.)  Plaintiff requested a hearing, and on July 19, 2022, Plaintiff appeared for an online video hearing before Administrative Law Judge Corey Ayling ("the ALJ").  (R. 108.)  The ALJ issued an unfavorable decision on August 18, 2022, finding Plaintiff was not disabled.  (R. 108-121.)

Following the five-step sequential evaluation process under 20 C.F.R. § 416.920(a),[3] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since August 27, 2021, the application date.  (R. 110.)

---

[2]    The Social Security Administrative Record ("R.") is available at Docket 13.

[3]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At step two, the ALJ determined that Plaintiff had the following severe impairments: generalized anxiety disorder; major depressive disorder; obesity; and posttraumatic stress disorder ("PTSD").  (R. 110.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 111.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") as follows:

> I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds; regarding balancing, no running, crouching, standing, or walking on slippery, narrow, or erratically moving surfaces; but retains the ability to maintain physical equilibrium while on feet for 8 hours so she would be on her feet for 8 hours but no crouching, standing, walking, running on slippery, narrow, or erratically moving surfaces. Environmental limitations: no work at unprotected heights; no work near moving mechanical parts (i.e., the kind of moving machinery such that a loss of balance and proximity to that machinery would pose severe safety hazard to life or limb). Mental restrictions, as followed: the individual can understand, carryout, and remember simple instructions, and use judgment as necessary to complete simple, routine, and repetitive tasks; the individual can adapt to and manage changes in a routine work setting, such as changes in processes and products that can be learned in a manner and time consistent with SVP 1 or SVP 2 work; regarding social interactions, the individual can respond appropriately to supervision, co-workers, and usual work situations, but no complex team work or other social interaction requiring a code lower than "8" on the people scale of the DOT, 1991 revised edition. Also, pose a pace restriction, as follows, able to meet the production standards of simple, routine, and repetitive work, but no assembly line work or other work similarly requiring varying fast pace.

(R. 113.)  The ALJ found that Plaintiff has no past relevant work.  (R. 119.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including: inspector, hand packager (DOT code 559.687-074, light, unskilled, SVP 2); small products assembler, bench (DOT code 706.684-022, light, unskilled, SVP 2); and marker (DOT code 209.587-034, light, unskilled, SVP 2).  (R. 120.)

Accordingly, the ALJ deemed Plaintiff not disabled from the date of her August 27, 2021 application, through the date of the ALJ's decision on August 1, 2022.  (R. 120-21.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-4.)  Plaintiff then commenced this action for judicial review.  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.  In this case, because Plaintiff's challenge is limited to an issue relating to her mental health, the Court recounts only the record and testimony relevant to that impairment.

## II.    RELEVANT RECORD

Predating her August 27, 2021 application date, Plaintiff was diagnosed with major depressive disorder, recurrent (ranging between moderate and mild), generalized anxiety disorder, and PTSD, and sought mental health treatment for the same, including psychotherapy and medication for her depression and anxiety.  (*See*, *e.g.*, R. 417, 419-34, 443, 445-56, 459, 461, 486, 470, 474, 477-78, 487, 491, 499, 503, 510-11, 514-15, 522-23, 527, 543, 547, 560-61, 569, 577-81, 593, 597, 601-04, 609, 617-188, 625-30, 633-34, 637-43, 650, 654-55, 659, 663, 675, 708-09.)  On August 10, 2021, her therapist noted as follows:

> Distress tolerance. Client reports her psychiatry provider has recommended she work toward taking solo trips in her car to run errands, rather than always going with someone else. She says she is willing to try short trips, but feels calm and safe when accompanied. She says she has no trouble finding someone in her building to go, so her needs are being met. She says she is getting along with all other residents, with no one giving her "drama." Discussed ways she is contributing to the peace. Processed emotions in session, validated, supportive counseling.

(R. 666.)  Plaintiff was able to stay at her brother's house after her sister's surgery to help care for her.  (R. 670.)  Plaintiff also noted that there was a potential for "conflict and drama" with others in her apartment building, but that she was able to effectively use her skills to deal with any challenges.  (R. 670.)

On August 24, 2021, Plaintiff reported that she had felt tired after socializing over the previous day, but that it could have been the result of being physically tired.  (R. 674.)  She also reported, "relationships going well in her building and good use of skills."  (R. 674.)

On August 31, 2021, Plaintiff reported no changes in her symptoms and that she was using skills learned during therapy to effectively manage relationships in her apartment building. (R. 677.) The mental health examination showed that she was oriented and pleasant; showed normal speech, an anxious mood, and appropriate affect; and that her insight was fair. (R. 678.) Her diagnosis was major depressive disorder, recurrent, moderate, and generalized anxiety disorder. (R. 678-79.)

On September 13, 2021, Plaintiff reported that she could not do her "homework" involving driving alone to a fast-food restaurant and ordering from her car because she was afraid to eat in her car in the parking lot due to feeling vulnerable to someone approaching the car. (R. 710.) Plaintiff did share that she went to some garage sales alone without needing someone to accompany her. (R. 710.) She also shared that she and her brother had a tradition of meeting at Costco, doing grocery shopping together, then eating lunch there, which comforted Plaintiff. (R. 710.) Plaintiff had frequent contact with supportive family and friends. (R. 711.) Plaintiff was diagnosed with major depressive disorder, recurrent, mild, generalized anxiety disorder, and PTSD. (R. 711.) The mental health examination showed that she was alert and oriented, showed appropriate behavior, her affect was constricted but congruent, and she was able to articulate her feelings well. (R. 710.)

On September 21, 2021, Plaintiff reported no changes in her symptoms and that she was using skills learned during therapy to effectively manage relationships in her apartment building. (R. 682.) She was sad that one of her friends in her building was leaving. (R. 683.) The mental health examination showed that she was oriented and

cooperative; she showed normal speech, a grieving mood, and appropriate affect; and her insight was fair.  (R. 683.)  Her diagnosis was major depressive disorder, recurrent, moderate, and generalized anxiety disorder.  (R. 684.)

On October 1, 2021, Plaintiff reported no changes in her symptoms and that she was using skills learned during therapy to effectively manage relationships in her apartment building.  (R. 687.)  She was upset that a resident in her building was saying untrue things about her behavior.  (R. 688.)  The mental health examination showed that Plaintiff was oriented and cooperative; she showed normal speech, an angry and anxious mood, and appropriate affect; and her insight was fair.  (R. 688.)  Her diagnosis was major depressive disorder, recurrent, moderate, and generalized anxiety disorder with no changes noted in her medications.  (R. 688-89.)

On October 5, 2021, Plaintiff was feeling less distressed about her interactions with other residents.  (R. 692.)  She claimed it was exhausting, but she was able to manage her emotions.  (R. 692.)  Plaintiff also reported being anxious about an upcoming housing inspection.  (R. 692.)  It was noted that there was no change in her medications, but that she had missed one dose the previous week.  (R. 692.)

On October 11, 2021, Plaintiff reported recent improvement, had a good visit with her brother and his family, and had made up with a friend in her building.  (R. 712.)  Plaintiff showed a brighter mood.  (R. 712.)  Plaintiff received a refill on all her psychiatric medications.  (R. 713-14.)

On October 12, 2021, Plaintiff reported unhappiness "with the support and services offered by her County Case Manager" and said "the Manager often blames

[Plaintiff] when she is mistreated by others in her housing and generally does not provide services or advocacy." (R. 696.) The mental health examination showed that she was oriented and pleasant, showed normal speech, an angry mood, and appropriate affect; and her insight was fair. (R. 696.)

On October 19, 2021, Plaintiff reported that she was going to see her uncle the same day, which typically improved her mood and that she seeking to replace her case manager. (R. 700.) The mental health examination showed that Plaintiff was oriented and friendly; she showed normal speech, an angry mood, and appropriate affect; and her insight was fair. (R. 700.)

On November 2, 2021, Plaintiff was seen for a follow up counseling session, during which she reported that she had an episode with another resident in her apartment building that was sexually inappropriate. (R. 799.) Plaintiff asserted that she was angry and would discuss the issue with building management. (R. 799.) On November 9, 2021, Plaintiff reported that she told building management about the individual and was able to get past the episode. (R. 810.)

On or about November 8, 2021, Plaintiff was assigned a case manager from the Guild to address her goals of improved hygiene, supporting her mental health by socializing with peers, and obtaining social security benefits. (R. 773-74.) A mental health examination on the same day showed that she was oriented, showed normal speech, was anxious and in an angry mood, had an appropriate affect, and that her insight was fair. (R. 800.)

During a November 11, 2021 visit for skin reaction, Plaintiff's mental exam showed that her mentation was normal, and that she had a normal and bright affect.  (R. 822.)

On November 15, 2021, Plaintiff reported that she was afraid of her building caretaker and did not want to talk about it out of fear that she would be overheard.  (R. 725.)  Plaintiff also noted that she had a recent visit with her brother and that she was going to her neighbor's place for Thanksgiving Day.  (R. 725.)  The mental health examination showed that she was oriented and friendly; showed appropriate behavior; spoke softly' was able to articulate needs well; and her affect was calm and pleasant, constricted, but congruent.  (R. 725.)

On November 30, 2021, Plaintiff reported to her case manger that she was not meeting her socialization goals because she is shy.  (R. 763.)

On December 6, 2021, Plaintiff reported to her therapist that she was doing well.  (R. 723.)

On December 7, 2021, Plaintiff told her therapist that "she has been able to navigate the 'dysfunctional' neighbors' relationship fairly effectively using interpersonal effectiveness skills."  (R. 851.)  She also reported feeling "low" due to the anniversary of the death of her father.  (R. 851.)

On December 8, 2021, Plaintiff reported seeing her friends at her apartment for fun and that she gotten closer to her brothers.  (R. 756.)

On December 10, 2021, Plaintiff reported to her case manager that she was "doing well".  (R. 752.)  She had been talking to her friends and her brothers.  (R. 752.)

On December 15, 2021, Plaintiff reported to her case manager that she did not like the building caretaker because she was bossy.  (R. 749.)

On December 16, 2021, state agency psychologist Erika Gilyot-Montgomery, PsyD, opined that Plaintiff had severe medically determined mental impairments of a Schizophrenia Spectrum and Other Psychotic Disorders; depressive, bipolar and related disorder; an anxiety related disorder; and a trauma-stressor related disorder.  (R. 184.)  As part of the social interaction portion of the mental RFC, Dr. Gilyot-Montgomery opined that Plaintiff was not significantly limited as to her ability to ask simple questions or request assistance and her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (R. 185.)  Dr. Gilyot-Montgomery also found that Plaintiff was moderately limited as to her ability to: interact appropriately with the general public, accept instructions and criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 185.)  Dr. Gilyot-Montgomery went on to find that: "Due to psych sxs, mild paranoia and social isolation, Clmt is able to interact briefly and superficially with public and others in a work setting."  (R. 185.)

On March 10, 2022, on reconsideration, state agency psychologist Russell Ludke, PhD, LP, found the same limitations as Dr. Gilyot-Montgomery with respect to Plaintiff's social functioning.  (R. 195-96.)

On December 20, 2021, Plaintiff reported that she was sad about the death of a medical provider that she had a very positive and close relationship with.  (R. 721.)

On January 5, 2022, Plaintiff noted that she was having difficulties setting boundaries with friends and acquaintances at her apartment building because others wanted to use her place to socialize and were not respectful of her space. (R. 914.) The mental health examination showed that she was oriented and pleasant, her affect was appropriate, she showed an angry mood, was coherent, and had fair insight. (R. 915.) Plaintiff went over exercises on how to set boundaries. (R. 915.) On February 1, 2022, Plaintiff asserted that she was surprised by her improvement in setting and keeping interpersonal boundaries. (R. 926.)

On January 12, 2022, Plaintiff reported to her case manager that she continued hanging out at with her friends, despite the spread of Covid. (R. 734.)

On January 24, 2022, Plaintiff reported that she did not fear her building caretaker, that she could discuss these issues with her friends, and that she was socializing before her session. (R. 717.) The mental health examination showed that she was oriented, showed appropriate behavior, and was calm and pleasant; her affect was restricted but congruent; and she was able to articulate her feelings. (R. 717.) Plaintiff's diagnosis was major depressive disorder, recurrent, mild; generalized anxiety disorder; and PTSD. (R. 717.)

On February 3, 2022, Plaintiff talked to her case manager about employment, but was set on trying to obtain social security benefits. (R. 728.) Plaintiff claimed to have some friends in the building, and they discussed a little bit about boundaries because she said that people liked to get in her business, and she did not have a lot of privacy. (R. 728.)

On February 7, 2022, Plaintiff was seen for a follow-up for her mental health. (R. 1003.) Plaintiff showed appropriate behavior, she had no difficulty communicating, her affect was constricted but congruent, she was feeling ill and tired, she had a case manager, and she had frequent contact with supportive family and friends. (R. 1003.)

On February 16, 2022, Plaintiff worked with her case manager to complete the social security income paperwork. (R. 1061.) When asked if she wanted to consider employment, Plaintiff responded, "no." (R. 1061.) Plaintiff claimed that she spent most of her time watching television or hanging out with her friends. (R. 1061.)

On March 15, 2022, Plaintiff's therapist, Jeff Davies, MA, LMFT, opined as follows:

> [Plaintiff] has a medical condition that substantially limits her ability to work now and for the foreseeable future as we treat her conditions. Her depression and anxious distress cause her to have difficulty with concentration, persistence, and pace. In addition, her condition negatively effects [sic] attendance.
>
> As a result of [Plaintiff's] disability, she is unable to work at this time and for the foreseeable future.

(R. 999.)

Therapist Davies diagnosed Plaintiff with major depressive disorder, recurrent, moderate, and generalized anxiety disorder. (R. 1000.) Her functional disability pertained to her cognitive ability and social functioning. (R. 1000.) His examination of Plaintiff showed she was well groomed; was cooperative; had normal speech, a logical thought process, and fair insight; and was within normal limits as to psychomotor activity. (R. 1000.) In addition, Plaintiff had a moderate limitation with respect to her

12

attention, concentration, and memory. (R. 1000.) He also opined that her symptoms were so severe that they would preclude Plaintiff from engaging in social and occupational activities. (R. 1000.) Therapist Davies relied on the medical record for this opinion. (R. 1001.) He also found that Plaintiff could only spend 20 percent of the day dealing with people and would need more than three absences a month due to her impairments. (R. 1001-02.)

On March 8, 2022, Plaintiff met with her case manager noting that she had seen some of her friends over the weekend for a little while. (R. 1063.) Plaintiff reported that she had otherwise stayed in her apartment watching television. (R. 1063.) Plaintiff claimed that she was going to meet with her brothers for lunch and mentioned how important they were to her. (R. 1063.) Plaintiff asserted that she did not want to think about employment due to her anxiety. (R. 1063.)

On April 18, 2022, Plaintiff reported to her case manager that she did not bathe because no one comes over to her apartment. (R. 1067.) On April 25, 2022, Plaintiff reported to her case manager that she continued to engage with her neighbors. (R. 1069.) There had been a decline in her social functioning due to anxiety, but she had a few friends and socialized with others. (R. 1071.) She was also close to her brother and uncle. (R. 1071.)

On May 25, 2022, Plaintiff told her case manager that her isolation had become progressively worse, including ignoring phone calls from friends and family. (R. 1081.) Plaintiff was going to reach out to her friend. (R. 1081.) On June 6, 2022, Plaintiff noted

that she had some friends that drained her emotionally and she discussed finding some friends that did not live in her apartment.  (R. 1085.)

On March 14, 2022, Plaintiff was seen for a telehealth follow-up for her mental health.  (R. 1004-05.)  Plaintiff claimed that she was "ok," but she appeared to be purposefully vague because she was at her mechanic.  (R. 1005.)  Plaintiff showed appropriate behavior, she had no difficulty communicating, her affect was constricted but congruent due to a lack of privacy, she had a case manager, and she had frequent contact with supportive family and friends.  (R. 1005.)

On March 28, 2022, Plaintiff was seen for another follow-up for her mental health.  (R. 1007.)  Plaintiff agreed to lower the dosage of one of her medications.  (R. 1007.)  Plaintiff showed appropriate behavior, she had no difficulty communicating, her affect was constricted but congruent due to her hives, she had a case manager, and she had frequent contact with supportive family and friends.  (R. 1007.)

On April 25, 2022, Plaintiff was again seen for a follow-up for her mental health.  (R. 1009.)  Plaintiff claimed there was "not much going on" and when asked to explain, said she was not doing much, and that her socializing had diminished.  (R. 1009.)  Plaintiff claimed that her therapist believed that she was more depressed and wondered if she needed an increase in her medication.  (R. 1009.)  Plaintiff showed appropriate behavior, she had no difficulty communicating, her affect was constricted but congruent, she could plan for the future, and she had a few close relationships.  (R. 1009.)

## III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).   "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007) (marks and citations omitted).   The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*   "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).   In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).   "Assessing and resolving credibility is a matter properly within the purview of the ALJ."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV.   DISCUSSION

Plaintiff argues that the ALJ failed to account for the state agency psychologists' opinions limiting her to brief and superficial interactions with others in a work setting

with infrequent changes, and failed to identify any specific limitations in the RFC or in any explanation that could adequately account for these limitations. (Dkt. 14 at 9-10.)

Plaintiff asserts that the state agency consulting psychologists separately evaluated her limitations and found that she could only engage in brief and superficial interactions with others, and while the ALJ found these opinions persuasive, the ALJ did not limit Plaintiff's interactions with coworkers and supervisors to brief and superficial interactions. (Dkt. 14 at 9-11.) Instead, Plaintiff appears to assert that the ALJ improperly limited her to "occasional" interactions, even though the RFC makes no such reference. (*Id.* at 11.) Plaintiff goes on to argue that the ALJ committed reversible error by not including the limitation to "superficial" and "brief" interactions with others in the RFC, as state agency psychologists both opined that interactions must be superficial and brief. (*Id.* at 11-12.) According to Plaintiff, the limitation to occasional interactions contained in the RFC does not adequately account for the need to have superficial and brief interactions, as the terms "occasional" and "superficial" or "brief" are not coterminous. (*Id.*) Plaintiff also argues that the inclusion by the ALJ in the RFC of the no "lower than '8' on the people scale of the DOT, 1991 revised edition" is also not an adequate translation for superficial contact. (*Id.* at 12-13.)

The Commissioner counters that Plaintiff does not challenge the supportability and consistency analysis with respect to the state agency psychologists and instead challenges the ALJ's choice to offer specificity regarding work restrictions instead of adopting vague terms like "brief" or "superficial." (Dkt. 16 at 8-10.) The Commissioner contends that any argument that the ALJ needed to use specific words like "brief" or "superficial"

is meritless, as the ALJ has no duty to replicate or parrot an opinion's limitation in her RFC finding.  (*Id.* at 8-10.)  The Commissioner also argued, in part, that even assuming that the ALJ was required to include a specific limitation of brief interactions with others, such a failure would not be of any consequence since all of the of the jobs relied on by the ALJ had the lowest level of possible interaction with people under the DOT and involved unskilled work.  (*Id.* at 11-12 & n.9.)  In addition, the Commissioner argues that substantial evidence in the record as whole supports the RFC with respect to social functioning.  (*Id.* at 12-15.)

A claimant's RFC is the "most [she] can do despite his limitations, including both physical and mental limitations."  *LeeAnthony C. v. Berryhill*, Case No. 18-cv-77 (NEB/TNL), 2019 WL 2343732, at *3 (D. Minn. May 13, 2019) (citing 20 C.F.R. § 416.945).  An ALJ's determination of "a claimant's RFC must be 'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations."  *Id.* (quoting *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013)).  "The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  *Ackerman v. Kijakazi*, Case No. 4:21-CV-814 PLC, 2023 WL 2496839, at *4 (E.D. Mo. March 14, 2023) (quoting *Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007)) (cleaned up).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Id.* (quoting *Combs v. Berryhill*, 878 F.3d 642, 646) (8th Cir. 2017)).

As stated previously, the ALJ imposed nonexertional limitations in the RFC, finding Plaintiff limited with respect to social functioning as follows:

> [R]egarding social interactions, the individual can respond appropriately to supervision, co-workers, and usual work situations, but no complex team work or other social interaction requiring a code lower than "8" on the people scale of the DOT, 1991 revised edition.

(R. 113.)  State agency psychologists opined as to Plaintiff: "Due to psych sxs, mild paranoia and social isolation, [Plaintiff] is able to interact briefly and superficially with public and others in a work setting."  (R. 185.)

In analyzing the state agency psychologists' opinions, the ALJ found as follows:

> Although the State Agency psychological consultants at the reconsideration and initial levels did not examine the claimant, they provided specific reasons for their opinions about the claimant's residual functional capacity reflecting the consultants grounded their opinions in the evidence in the case record, including careful consideration of the treating opinions and the claimant's allegations about her symptoms and limitations. I found the evidence received into the record after the reconsideration determination did not provide any new or material information that would alter the State Agency psychological consultants' opinion about the claimant's residual functional capacity. **I found their opinions persuasive. I note I used different vocational terminology than the State Agency psychological consultants.** (Exhibits C3A and C5A)

(R. 119 (emphasis added).)

As noted previously, Plaintiff argues that the inclusion by the ALJ in the RFC of the no lower than "8" on the people scale of the DOT is not an adequate translation for superficial contact.  (*Id.* at 12-13.)  According to Appendix B of the DOT, the fifth number of the nine-digit code reflects the job's relationship to people.  *See* Dictionary of Occupational Titles, App. B—Explanation of Data, People, & Things, 1991 WL 688701. The DOT rates the amount of interaction with people on a scale of 0-8, with 8

representing the lowest possible level of human interaction that exists in the labor force. *See Toni M. P. v. O'Malley*, No. 23-CV-013-MTS, 2024 WL 988382, at *7 (N.D. Okla. Mar. 7, 2024) (quoting *Lane v. Colvin*, 643 F. App'x 766, 770 n.1 (10th Cir. 2016)) ("'The DOT rates the amount of interaction with people on a scale of 0-8, with 8 representing the lowest possible level of human interaction that exists in the labor force.'").  That ranking describes the need to take instructions as only "[a]ttending to the work assignment instructions or orders of supervisor" with "[n]o immediate response required unless clarification of instructions or orders is needed." 1991 WL 688701.  By way of comparison, the ranking of interactions with people under the DOT, including level 8, is as follows:

> PEOPLE: Human beings; also animals dealt with on an individual basis as if they were human.
>
> 0 Mentoring: Dealing with individuals in terms of their total personality in order to advise, counsel, and/or guide them with regard to problems that may be resolved by legal, scientific, clinical, spiritual, and/or other professional principles.
>
> 1 Negotiating: Exchanging ideas, information, and opinions with others to formulate policies and programs and/or arrive jointly at decisions, conclusions, or solutions.
>
> 2 Instructing: Teaching subject matter to others, or training others (including animals) through explanation, demonstration, and supervised practice; or making recommendations on the basis of technical disciplines.
>
> 3 Supervising: Determining or interpreting work procedures for a group of workers, assigning specific duties to them, maintaining harmonious relations among them, and promoting efficiency. A variety of responsibilities is involved in this function.
>
> 4 Diverting: Amusing others, usually through the medium of stage, screen, television, or radio.

5 Persuading: Influencing others in favor of a product, service, or point of view.

6 Speaking-Signaling: Talking with and/or signaling people to convey or exchange information. Includes giving assignments and/or directions to helpers or assistants.

7 Serving: Attending to the needs or requests of people or animals or the expressed or implicit wishes of people. Immediate response is involved.

8 Taking Instructions-Helping: Attending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to "non-learning" helpers.

*Id.*

According to the DOT, "[a]s each of the relationships to People represents a wide range of complexity, resulting in considerable overlap among occupations, their arrangement is somewhat arbitrary and can be considered a hierarchy only in the most general sense." *Id.*

Plaintiff relies on *Tiffany B. v. Kijakazi*, No. 22-CV-1227 (ECT/DLM), 2023 WL 3958424 (D. Minn. May 22, 2023), *R. & R. adopted*, 2023 WL 3955348 (D. Minn. June 12, 2023), for the proposition that the ALJ's decision to alter or substitute the people rating scale for agency experts' limitation to superficial contact was flawed. (Dkt.14 at 13-14.) The facts in *Tiffany B.* are distinguishable from the present case. In *Tiffany B.*, the issue presented to the Court was as follows:

Plaintiff asserts that in determining her RFC, the ALJ inexplicably omitted certain limitations recommended by two state psychological experts, resulting in an RFC that did not reflect her actual impairments, and did so without the explanation legally required under 20 C.F.R. § 416.920c. Drs. Boyd and Biscardi both opined that Plaintiff's workplace interactions must

be "brief" and "superficial." (Tr. at 234, 250.) The ALJ omitted these two limitations from Plaintiff's RFC, however, instead finding that Plaintiff could tolerate "occasional" workplace interactions without comment on the length or quality of each contact.

2023 WL 3958424, at *2 (internal footnotes omitted).  The court went on to consider whether the ALJ's partial rejection of the prior administrative medical findings by the state experts was harmless error:

Whether the error here was harmless presents a close question. The ALJ determined that someone with Plaintiff's limitations could perform the jobs of document preparer, touch-up screener, and semi-conductor bonder. (Tr. at 31.) As the Commissioner correctly notes, each of these jobs already assume a "Level 8" amount of interpersonal interaction, which is the lowest level recognized by the Dictionary of Occupational Titles. See DOT App'x B, Explanation of Data, People and Things (identifying Level 8 interactions as "[a]ttending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.)"). According to the Commissioner, swapping Plaintiff's requested language about the quality and duration of interpersonal interactions into her RFC would make no difference, since Level 8 jobs already assume an extremely limited amount of interpersonal contact.

In prefacing the description of its eight different "levels" of "People" relationships, the DOT cautions that "each of the relationships to People represents a wide range of complexity, resulting in considerable overlap among occupations," such that "their arrangement is somewhat arbitrary and can be considered a hierarchy only in the most general sense." DOT App'x B, Explanation of Data, People and Things (Preamble). Put more simply, the DOT's quantification of the "level" of interpersonal interaction necessary for each job is imprecise. As such, the Court declines the Commissioner's invitation to assume that each and every Level 8 job could satisfy a limitation that the claimant only have brief and superficial workplace interactions.

*Id.* at *5; *see also Nathan L. v. O'Malley*, No. 23-CV-1310 (JWB/DJF), 2024 WL 3015139, at *6 (D. Minn. May 3, 2024), *R. & R. adopted*, 2024 WL 3014866 (D. Minn. June 14, 2024).

21

Here, however, the ALJ found the state agency experts' opinions persuasive and specifically noted that he used different vocational terminology, and ultimately included in the RFC that Plaintiff could not engage in any "complex team work or other social interaction requiring a code lower than '8' on the people scale of the DOT, 1991 revised edition." (R. 113.) As set forth above, the ALJ in *Tiffany B.* did not include the specific Level 8 limitation in the RFC, instead using "occasional" workplace interactions with others instead of the "brief" and "superficial" contacts opined by the agency experts.

While Plaintiff focuses on what she characterizes as the imprecise nature of the DOT's hierarchy of the levels in the ranking of interactions with people, she seeks a ruling that the ALJ erred by failing to limit her to superficial contacts. But "the term 'superficial' is defined by neither the DOT nor in Social Security regulations, SSRs, or HALLEX." *Amber L. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-00202, 2022 WL 2948952, at *6 (S.D. Ohio July 26, 2022), *R. & R. adopted*, 2022 WL 3226351 (S.D. Ohio Aug. 10, 2022). Indeed, as one court has explained:

> "Superficial" social interaction has no regulatory definition. And while the state agency psychologists opined Plaintiff should be limited to superficial interactions, neither defined what "superficial" meant. Accordingly, precisely how the RFC's limitations differ from superficial interaction limitations—if they do at all—is unclear.

*Sasha M. v. Comm'r of Soc. Sec.*, No. 2:22-CV-2101, 2023 WL 1793536, at *9 (S.D. Ohio Feb. 7, 2023) (citing *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 276 (6th Cir. 2015)) (citations omitted). The Eighth Circuit has recently rejected arguments that the failure to parrot the term "superficial" requires automatic reversal of the ALJ's denial

of benefits, especially where the ALJ addressed the quality of a claimant's workplace

interactions:

> Lane argues that the ALJ's reference to "occasional" interactions is inconsistent with the shared opinion of two psychologists, which the ALJ found persuasive, that he could have "superficial" interactions. He reasons that because the terms are different—the former being about quantity and the latter about quality—omitting the psychologists' limitation renders the expert's conclusion unreliable and the ALJ's decision without substantial evidence.

> **We reject this manufactured inconsistency**. The psychologists noted that Lane could relate to others superficially, work in small groups, and maintain at least minimal relationships with others. Nothing in the reference to "occasional" interactions conflicts with that opinion. And the ALJ, considering the entire record, addressed the quality of Lane's workplace interactions: no team, tandem, or public-facing work. We decline to nitpick its well-reasoned decision.

*Lane v. O'Malley*, No. 23-1432, 2024 WL 302395, at *1 (8th Cir. Jan. 26, 2024) (citation

omitted) (emphasis added).

Even acknowledging that the ranking of the DOT's description of its eight

different "levels" of people can be considered a hierarchy only in the most general sense,

it still remains that a people relationship code of 8 represents the lowest possible level of

human interaction that exists in the labor force. The Court concludes that the ALJ's

reference to no complex teamwork or other social interaction requiring a code lower than

"8" on the people scale does not conflict with the opinions of the state agency

psychologists. Indeed, courts have concluded that an RFC limitation of social interaction

limitation of 8 on the people scale of the DOT is consistent with limitations of brief and

superficial interactions with people in the workplace. *See*, *e.g.*, *Joseph J. B. v. Comm'r of*

*Soc. Sec.*, No. 1:23-CV-00652 (BKS/CFH), 2024 WL 4217371, at *14 (N.D.N.Y. Aug.

29, 2024) ("Positions categorized as involving level 8 interaction can be performed by

individuals who require limited interaction with supervisors and others.") (collecting

cases and quotation marks omitted), *R. & R. adopted sub nom.*, 2024 WL 4216048

(N.D.N.Y. Sept. 17, 2024); *Ammie Y. v. Kijakazi*, No. 2:22-CV-00126-RHW, 2023 WL

6367659, at *1 (E.D. Wash. Sept. 29, 2023) ("Courts have determined that level 8

interaction is compatible with an RFC limiting a claimant to only superficial contact with

coworkers, supervisors, and the public.") (citations omitted); *Scott C. v. Comm'r of Soc.*

*Sec.*, No. 2:20-CV-00109, 2021 WL 2682276, at *5 (D. Vt. June 30, 2021) ("Courts have

held that level 8 interaction is compatible with an RFC limiting a claimant to only

superficial contact with coworkers, supervisors, and the public.") (cleaned up); *Alie v.*

*Berryhill*, No. 4:16CV1353, 2017 WL 2572287, *16 (E.D. Mo. June 14, 2017) (finding

that "[l]evel 8 interaction is compatible with a[n] RFC limiting a claimant to only

superficial contact with coworkers, supervisors, and the public.") (citation omitted);

*Connor v. Colvin*, No. 1:13-cv-00219-JAW, 2014 WL 3533466, at *4 (D. Me. July 16,

2014) (construing a rating of "not significant" for the category "People: 8 – Taking

Instructions – Helping" as "consistent with limitations to occasional, brief, and

superficial contact with coworkers and supervisors") (citations omitted); *see generally,*

*Flaherty v. Halter*, 182 F. Supp. 2d 824, 851 (D. Minn. 2001) (finding jobs with "not

significant" levels of social interaction at Level 6 under the DOT compatible with ALJ's

limitation to "brief superficial type of contact with co-workers and supervisors and

members of the public as a part of the job task[s]").

The decision in *Katie R. v. O'Malley*, No. CV 23-1139 (PAM/DLM), 2024 WL 1050822 (D. Minn. Mar. 11, 2024), also supports the ALJ's decision to incorporate a brief and superficial limitation to level 8 of the DOT.  In *Katie R.*, the ALJ determined that the plaintiff was limited to "brief and superficial interaction with coworkers and supervisors meaning the fifth digit of the DOT code is a 6, 7, or 8."  (23-cv-1139, Dkt. 8 at R. 47.)  The plaintiff argued that the ALJ erred in formulating her RFC by defining "brief and superficial contact" as limited to jobs in which the "fifth digit of the DOT code is a 6, 7, or 8."  *Katie R.*, 2024 WL 1050822, at *2 (footnote omitted).  The court disagreed, finding:

> [T]he ALJ did not err in defining what he meant by "superficial" with reference to the DOT code. Rather, "[t]he ALJ expounded on the definition of 'superficial' in the context of Plaintiff's RFC, in essence describing how a vocational expert might incorporate the limitation into the expert's evaluation of whether jobs exist in the national economy that are consistent with Plaintiff's functional limitations."

*Id.* at *3 (quoting *Jamie E. v. Kijakazi*, No. 22-CV-2393 (ECT/JFD), 2023 WL 5021807, at *2 (D. Minn. Aug. 7, 2023)).

Further, it is important to note, as argued by the Commissioner (Dkt. 16 at 12 n.9), that the ALJ limited Plaintiff to unskilled work.  (R. 60.)  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  Social Security Ruling 83-15, Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely

Nonexertional Impairments, 1985 WL 56857, at *4 (Social Sec. Admin. Jan. 1, 1985). "A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id.* "These jobs **ordinarily involve dealing primarily with objects, rather than with data or people**. . . ." *Id.* (emphasis added). This is the type of work the ALJ set forth in the RFC. *See Jennifer O. v. O'Malley*, No. 22-CV-2273 (KMM/ECW), 2024 WL 86277, at *4 (D. Minn. Jan. 8, 2024) (finding that limitations regarding social interactions in the workplace are "'commonplace in unskilled work that involves 'dealing primarily with objects, rather than with data or people,' which is the type of work that the ALJ recommended for Ms. O.") (quoting *Dereschuk v. Colvin*, No. 15-CV-86 (TNL), 2016 WL 9454329, at *25 (D. Minn. Mar. 28, 2016), quoting SSR 85-15, 1985 WL 56857, at *4)), *aff'd sub nom. Dereschuk v. Berryhill*, 691 F. App'x 292 (8th Cir. 2017)).

Based on the record as a whole, the Court finds that the RFC, including the ALJ's omission of Plaintiff's preferred language of a "brief" and "superficial" interactions with others was not in error and is supported by substantial evidence. To the extent that Plaintiff is arguing that the RFC should have been more restrictive, there is simply no evidence she was having difficulty interacting with others to the level that would require additional restrictions. The record supports that overall, Plaintiff enjoyed and sought out being around other people, and to the extent that she had issues with others, she was able to appropriately deal with interpersonal conflicts. (*See, e.g.*, R. 670, 677, 682, 687, 710, 711, 717, 725, 728, 734, 810, 851, 926, 1003, 1005, 1009, 1063.) A claimant's daily activities are one factor an ALJ must consider when evaluating the claimant's testimony

and subjective limitations.  *See Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022)

("While daily activities alone do not disprove disability, they are a factor to consider in

evaluating subjective complaints of pain.").  Further, outside of an occasional anxious

mood or an articulation of anger (managed with medication and counseling (*see Milam v.*

*Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding that a pattern of limited and

conservative treatment is a proper factor for an ALJ to consider in weighing subjective

reports)), Plaintiff's mental examinations during the relevant period were largely normal

and stable (*see, e.g.*, R. 678, 683, 688, 692, 710, 711, 717, 725, 800, 822, 915, 1000,

1003, 1005, 1007, 1009).

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**RECOMMENDED** that:

1.    Plaintiff's request for reversal or remand of the Commissioner's decision

(Dkt. 14) be **DENIED**;

2.    The Commissioner's request that the Court affirm the decision (Dkt. 16) be

**GRANTED**; and

3.    The Complaint (Dkt. 1) be **DISMISSED WITH PREJUDICE**.


DATED:  October 18, 2024                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).